UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
____

ROBERT L. DYKES-BEY et al.,

        Plaintiffs,                Case No. 2:20-cv-65

v.                                         Honorable Robert J. Jonker

HEIDI WASHINGTON et al.,

        Defendants.
_____/

**OPINION**

This is a civil rights action brought by 14 state prisoners under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiffs' *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiffs' allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiffs' complaint for failure to state a claim.

**Discussion**

**I.**      **Factual allegations**

All 14 Plaintiffs are presently incarcerated with the Michigan Department of Corrections (MDOC) at the Kinross Correctional Facility (KCF), in Kincheloe, Michigan. The events about which they complain are occurring at that facility. Plaintiffs sue Defendants MDOC

Director Heidi Washington, Deputy Director Kenneth McKee, and KCF Warden M. Brown in their respective individual and official capacities. Plaintiffs allege that their present confinement at KCF violates their right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment and their right to due process as guaranteed by the Fifth and Fourteenth Amendments. Plaintiffs contend that their rights are violated because Defendants are subjecting him to the threat and imminent danger of contracting the deadly COVID-19 virus.

Plaintiffs assert that at least 11 of the Plaintiffs face a heightened risk in the event of any COVID-19 infection. Plaintiffs range in age from 28 to 79 years old, with 11 of the 14 Plaintiffs aged 48 years old or older. Plaintiffs further state that 11 of the Plaintiffs have a history of medical conditions. They do not list which 11 Plaintiffs have medical conditions, nor do they provide a comprehensive list of the conditions. Plaintiffs Davis and Rivers provide declarations (ECF Nos. 1-2, 1-3), which have been attached to the complaint, that allege they suffer from medical conditions. These conditions include diabetes, hypertension, sleep apnea, emphysema, and chronic neck issues. Plaintiffs allege several facts about prison confinement generally and the specific conditions of his confinement at KCF that allegedly would permit and even facilitate transmission of the COVID-19 virus. To free themselves from the danger of transmission, Plaintiffs ask the Court to enter an injunction compelling Defendants to place them into single-prisoner cells or in lower-density facilities. Plaintiffs further seek compensatory and punitive damages in the amount of $150,000 from each Defendant.

II.     **Failure to state a claim**

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

2

more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III. Eighth Amendment

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it

3

contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiffs claim that, at KCF, they are in a high degree of danger of contracting COVID-19. The Court notes that as of the date that this opinion is being written, there has been only one confirmed case of a prisoner with COVID-19 at KCF out of 1,530 prisoners. (*See* https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337 (visited May 26, 2020).) Moreover, the Court notes that the MDOC has taken extraordinary measures to limit the threat posed by COVID-19. These measures include:

4

**Personal Protective Equipment, cleaning and mitigation measures**
- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear.  Each employee and prisoner received three masks each and the masks can be laundered and worn again.  Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns.  Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering.  Michigan State Industries is also manufacturing gowns, protective eyewear and protective suits.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning.  Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use.  Cleaning efforts have been doubled at facilities with vulnerable prisoner populations.  We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap.  Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask.  Additional soap will be provided at no charge.  CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities.  These are the same posters you will see in your community and throughout State of Michigan office buildings.
- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart.  Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard.  Activities such as basketball and weight pit have been suspended to encourage social distancing, as well.  There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.
- The department has been leading the nation when it comes to consistent testing of the prisoner population when they have symptoms.  We have now started a system of expanded testing beginning at Lakeland Correctional Facility.  All prisoners at Lakeland are expected to be tested by the end of the week of April 19 and testing is expected to begin at G. Robert Cotton Correctional Facility the week of April 26.

**Visits and Transfers**
- Visitation at facilities statewide was suspended as of March 13.
- The department worked with communication vendors GTL and JPay to provide enhanced services for prisoners to communicate with family and friends during the period without visits. Detailed information from those companies is being relayed to the prisoner population.  JPay is continuing to offer two free stamps per week through June 2, 2020.  GTL is providing one free, five-minute phone

5

- call every seven days for the first two weeks of May 2020 and, for the entire month of May, GTL will reinstate the internet and mobile fees with reduced rates. The regular $2.95 transaction fee has been reduced to $1.95 and the $.95 [sic] transaction fee has been reduced to $0.95. We will continue to work with the companies on anything else they may be willing to provide.
- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately. The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses. Core programming and school classes taught by MDOC staff will continue.
- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol. Attorney visits will continue to be authorized.
- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.
- Transfers of offenders with new sentences from county jails in the community have been suspended. The department also issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.

**Quarantine and Care of Sick Prisoners**
- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC can test the prisoner.
- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.
- Prisoners who test positive will be transferred to one of the department's designated quarantine units at either G. Robert Cotton Correctional Facility, Carson City Correctional Facility or the former Maxey Annex, which is located near Woodland Center Correctional Facility. The Maxey Annex previously housed juvenile offenders under the jurisdiction of MDHHS, prior to its closure, and the MDOC had been working to convert it to a training site. These units are in buildings that are completely separated from each of the correctional facilities. They have limited movement and access to these units is extremely limited. Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering. Those staff members report directly to the unit and do not enter the main correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.
- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.
- Co-pays for prisoners who need to be tested for COVID-19 have been waived.

- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated. Prisoners who require outside medical attention will be transported to an area hospital for treatment.

**Recovery**
- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.
- A unit has also been established at Central Michigan Correctional Facility for recovered prisoners who previously tested positive for the virus. These prisoners are considered officially recovered by the Michigan Department of Health and Human Services, have no symptoms, are not considered contagious, have been medically cleared by the MDOC's chief medical officer, and must test negative before they are moved to the unit at Central. Not all of the prisoners coming to Central's unit will come from Gus Harrison Correctional Facility's step-down unit. With the number of prisoners who are placed at the COVID positive units at Macomb Correctional Facility, G. Robert Cotton Correctional Facility and Carson City Correctional Facility, not all will move to Gus Harrison Correctional Facility, given there are only 120 beds in the facility's step-down unit. It is possible prisoners will come from other locations, but ONLY if they have since tested negative, and it has been 28 days at least since the onset of their symptoms. The department is NOT sending COVID-19 positive prisoners to Central.

**Parole Information**
- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time. In addition, the department will begin holding remote public Parole Board hearings for parolable life sentence and clemency cases. You can find more information on scheduled hearings and how to participate here.
- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.
- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness. However, individuals designated by a prisoner as a parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.
- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration. If there are changes in the prisoner's case, the prisoner will be notified directly.
- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.

- All of our paroles are done with public safety in mind. The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.
- All prisoners set to parole must take a COVID-19 test before being released. The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time. There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release. As a result, a limited number of parole dates may be changed to accommodate these processes. If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms. Prisoners who test negative will be paroled as scheduled.

(*Id.*) In addition, on May 22, 2020, the MDOC issued a press release, indicating that it had completed testing of every prisoner in the 29-prison system in less than 15 days. *See* MDOC Press Release, https://www.michigan.gov/corrections/0,4551,7-119-1441_26969-529997--,00.html (last visited May 26, 2020).

In light of the minimal level of infection at KCF and the significant measures undertaken by Defendants to secure prisoner safety and prevent infection, Plaintiffs cannot show that Defendants have been deliberately indifferent to Plaintiffs' serious risk of physical harm. While the Court is sympathetic to Plaintiffs' general concern about the COVID-19 virus, speculation about the mere possibility that they will become infected by the virus does not rise to the level of an Eighth Amendment violation.

**IV.    Due process**

Plaintiffs allege that Defendants have deprived them of due process by virtue of their response to the COVID-19 threat. The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be

8

no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

Plaintiffs do not clearly identify the liberty interest at issue in their complaint. They complain that MDOC policies to reduce face-to-face interactions with staff for non-emergency health care visits have diminished privacy protections. Although the Sixth Circuit has recognized that prisoners may have a constitutional privacy right in their own sensitive medical information, *see Moore v. Prevo*, 379 F. App'x 425, 427 (6th Cir. 2010), Plaintiffs do not allege that they themselves have suffered any injury as a result. The allegations do not state that any Plaintiff has had sensitive medical information disclosed or that any Plaintiff has refused to seek health care because of the policy. Therefore, they cannot meet their burden to establish an injury to establish standing much less state a claim challenging the policy. *See Lujan v. Defenders of Wildlife et al.*, 504 U.S. 555, 560-61 (1992).

Plaintiffs do not otherwise complain about deprivation of liberty interests caused by the steps Defendants have taken to protect them, even though those steps may have curtailed some of Plaintiffs' liberties. Instead, they are focused only on Defendants' failure to completely eliminate the dangers of COVID-19 transmission inherent in the prison setting. Reading the complaint with all due liberality, *Haines*, 404 U.S. at 520, the Court concludes that Plaintiffs attempt to assert a violation of their substantive due process rights under the Fourteenth Amendment.

"Substantive due process prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002). "Substantive due process serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the

fairness of the procedures used." *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it 'violates the "decencies of civilized conduct."'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952))).

However, "[w]here a particular [a]mendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that [a]mendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens, and the Eighth Amendment provides the standard for such searches of prisoners)). If such an amendment exists, the substantive due process claim is properly dismissed. *Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013). In this case, the Eighth Amendment provides an explicit source of constitutional protection to Plaintiffs concerning Defendants' alleged failures to protect them. *See Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (because the Eighth Amendment supplies the explicit textual source of constitutional protection for claims governing a prisoner's health and safety, the plaintiff's substantive due process claim was subject to dismissal). As a consequence, Plaintiffs' substantive due process claim must be dismissed.

V.    **Preliminary injunction and temporary restraining order**

Plaintiffs have also filed a motion for a temporary restraining order and preliminary injunction. (ECF No. 32.) Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of

preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000).

In exercising that discretion, a court must consider whether a plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also S. Galzer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ("[T]hese are factors to be balanced, not prerequisites to be met."); *National Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (same); *Ne. Ohio Coal.*, 467 F.3d at 1009 (same). Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

Under controlling Sixth Circuit authority, Plaintiffs' "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action. *NAACP v. Mansfield*, 866 F.2d 162,

11

167 (6th Cir. 1989). Because Plaintiffs have failed to state a claim for relief, they certainly have not shown a strong likelihood of success on the merits.

Second, although COVID-19 infection carries the risk of causing irreparable harm, Plaintiffs have failed to show that they are subject to any risk, much less a significant risk, of COVID-19 infection under the present circumstances. Therefore, Plaintiffs' allegations fail to demonstrate irreparable harm that is avoidable by a preliminary injunction.

Finally, the interests of identifiable third parties and the public at large weigh against an injunction. Decisions concerning prison security are vested in prison officials, in the absence of a constitutional violation. Any interference by the federal courts in the administration of state prisons is necessarily disruptive. The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights. *See Glover*, 855 F.2d at 286-87. That showing has not been made here. Accordingly, Plaintiffs' motion for preliminary relief will be denied.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiffs' complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). The Court does not certify that an appeal would not be in good faith.

Should Plaintiffs appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiffs are barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If they are

barred, they will be required to pay their portion of the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.


Dated:   September 2, 2020           /s/ Robert J. Jonker
                                                     ROBERT J. JONKER
                                                     CHIEF UNITED STATES DISTRICT JUDGE